**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ×

Dominique Davila, Hannah Samuels, Noelia
Beltran, and Aminata Bamba, on behalf of
themselves and all other similarly situated
employees,

        *Plaintiffs,*

    *v.*

Skinny's Cantina on the
Hudson and Joseph Licul,

        *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ×

**COMPLAINT**

**1:24-cv-4871**

**JURY REQUESTED**

    Plaintiffs Dominique Davila, Hannah Samuels, Noelia Beltran, and Aminata Bamba ("Plaintiffs"), by their counsel, Harman Green PC, allege for their Complaint against Defendants Skinny's Cantina on the Hudson and Joseph Licul ("Defendants") as follows.  This Complaint is alleged on the Plaintiffs' behalf, and on behalf of all similarly situated employees, referred to as "Class Members."

## PRELIMINARY STATEMENT

1.    This case is about rampant race, sex, and body size discrimination.

2.    Plaintiffs were harassed based on the color of their skin, and subjected to sexually harassing comments and acts.

3.    As well, Defendants have a pattern and practice of failing to comply with the Fair Labor Standards Act ("FLSA") and the New York Labor Law, and would routinely fail to pay overtime or to pay employees in a timely manner.

## JURISDICTION

4.    Pursuant to 28 U.S.C. §1331 this Court may properly hear Plaintiff's claims as they arise under a federal statute.

5.    Pursuant to 28 U.S.C. §1367 this Court may properly hear Plaintiff's State and local

1

law claims as they arise out of the same nucleus of operative fact so as to create the same case or controversy.

## PARTIES

6.     Plaintiff Dominique Davila was and is a resident of New York.

7.     Plaintiff Hannah Samuels was and is a resident of New York.

8.     Plaintiff Noelia Beltran was and is a resident of New York.

9.     Plaintiff Aminata Bamba was and is a resident of New York.

10.     Defendant Skinny's Cantina on the Hudson is a Mexican cuisine restaurant and has a place of business at 701 W 133rd St., New York, NY 10027.

11.     Defendant Joseph Licul is the owner and operator of Defendant Skinny's Cantina on the Hudson and, upon information and belief, is a resident of New York.

## JURY DEMAND

12.     Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

13.     Plaintiffs' claims are presented individually, with the Class allegations following. The similarities between each Plaintiff's story outshine the differences between them, particularly with respect to the class and collective claims.

### Plaintiff Dominique Davila

14.     Plaintiff Davila is a Black woman who began working for Defendants in 2021.

15.     Plaintiff Davil, early on in her employment, was told by the General Manager, Chris, that he would "ear [her] up in that dress." This comment signaled what would become a long history of sexual harassment and offensive commentary by Defendants' managers.

16.     Chris also hired Plaintiff Davila telling her she would be paid an hourly rate and a commission of 15% for every party she brought into the restaurant.

17.     Plaintiff Davila was never paid that commission.

18.    Chris soon overtook more shifts, and, thus, had more interactions with Plaintiff Davila, and frequently made inappropriate, sexual comments, such as offering oral sex to her while at work.

19.    These advances were unwarranted and unwanted.

20.    Plaintiff Davila rejected and ignored Chris.    During the fifth week of her employment, Plaintiff Davila came to work, on a Friday, and was told by Ariana that she was being terminated.

21.    Plaintiff Davila asked why and was told only that Chris had made the decision.

22.    Plaintiff Davila then confided in Gabriel about the termination.    Gabriel told Plaintiff Davila that he was not surprised by the behavior.    Plaintiff Davila then stated she would be reaching out to a lawyer.

23.    The next day, Chris offered Plaintiff Davila her job back.

24.    These offensive comments persisted for years during Plaintiff Davila's employment.

25.    In October 2022, Plaintiff Davila was attacked by customers and Chris, again, fired her, this time for 'violence.'

26.    This was later reversed as security footage showed that Plaintiff Davila was not violent towards anyone.

27.    Shortly after, Plaintiff Davila took a leave from Skinny's Cantina and worked at another establishment, being told that she could return in the spring when business picked up.

28.    Upon learning that Plaintiff Davila had accepted new employment, Chris called that establishment and wrongfully claimed that Plaintiff had been terminated for stealing.

29.    In March 2023, a disgruntled customer spat on Plaintiff Davila.

30.    Plaintiff Davila immediately informed Chris, who was the manager that day.

31.     Chris then proceeded to blame Plaintiff Davila for the incident and sought to remedy it by asking "would it make you feel better if I spit on you?," offering the question in a sexual manner.

32.     Plaintiff Davila would report Chris' conduct to Miriam Garcia, the human resources manager for all of Defendant Joseph Lucil's properties, but Ms. Garcia simply ignored her concerns.

33.     Plaintiff Davila continued to complain about Chris, and Ms. Garcia eventually told her, in April 2023, that she would look for a new position for Plaintiff Davila.

34.     Shortly thereafter, Ms. Garcia told Plaintiff Davila that Chris was no longer employed, and she could return to Skinny's Cantina.

35.     Plaintiff Davila was then offered a position at $18/hr.

36.     Plaintiff Davila was then told she would never be promised her owed commissions.

37.     Plaintiff Davila also accepted a position as a part time server.

38.     Coworkers told Plaintiff Davila not to question management about the tip pooling system.

39.     One coworker, Arlene, quit in June 2023 because she was both not being paid in a timely manner and because, when she was being paid, the checks bounced.

40.     Plaintiff Davila later took on more server time as a server, Brianna, quit because her cash tips were not being paid out to her in full.

41.     Plaintiff Davila also questioned tip pooling, which greatly irritated Ariana, a lead server and supervisor over Plaintiff.

42.     A few days after Plaintiff Davila first questioned Ariana about this, Ariana sent her home early from her shift.  Plaintiff asked to stay because she had spent money on an Uber to travel in, but this was ignored.

4

43.     When Plaintiff Davila questioned "admin fees" on her check, she was told that she would be given a write up if she questioned it.

44.     Skinny's Cantina saw a reorganization in the summer and fall of 2023, and two new managers, Ibtissam Chahir and Humberto, were added on.

45.     Ms. Chahir then told Plaintiff Davila that she would be receiving part of the tips from the tip pool because "it's Joe's restaurant and he can tip me if he wants."

46.     Ms. Chahir was not a tip exempt employee, not a server, and was illegally taking wages from tip exempt employees.

47.     In October 2023, Humberto confided in Plaintiff Davila that Ariana wanted to fire certain employees, including Lilibeth because she 'didn't like her,' Erika because she complained that another employee had sexually assaulted her, Plaintiff Beltran because she was "too fat," Plaintiff Samuels because she was "scared of her," and Plaintiff Bamba because she "steals."

48.     Humberto also confided that Ariana and Ms. Garcia wanted to fire Plaintiff Davila because she "complains and voices her opinions" and that they were concerned about "her look."

49.     Ms. Chahir would often comment that she wanted to change the Skinny's Cantina customer base, which is predominantly Black, and frequently made negative comments about people who were Black and/or 'plus sized.'

50.     Plaintiff Davila, in the spring 2024, was told to wear a mini skirt during a work event.

51.     Plaintiff Davila expressed concern that a mini skirt would rise on her because of her body shape and that it would be incredibly revealing.

52.     Plaintiff Davila was told to acquire a mini skirt by the following Tuesday or she would receive a write up.

53.     By this point, Plaintiff Davila had not been paid her latest paycheck for over two

and a half weeks.

54.     Plaintiff Davila complained to Humberto that "weight is such a big issue in this industry" and that she felt undervalued by Defendants because of her weight.

55.     Humberto agreed that "in this industry we will encounter ungrateful, bigots and despicable ppl."

56.     At the work event that Plaintiff was told to wear a mini skirt, Ms. Chahir asked Plaintiff Davila to 'go live on Instagram' and promote the business, which she successfully did, and brought in a party of 10 who spent a significant amount of money on alcohol.

57.     Plaintiff Davila was then given a write up for 'being on her phone at work.'

58.     On May 21, 2024, Plaintiff complained, via WhatsApp, that food servers were bringing food to wrong tables because managers were having customers move from one table to another, and that in Plaintiff's opinion "we need better communication and organization."

59.     On May 21, 2024, Plaintiff complained that management does not value staff, and that staff have to deal with "bounced checks" and have "been without pay for weeks."

60.     On May 21, 2024, Plaintiff complained that her schedule was taken because she expressed concerns about pay and discrimination.

61.     Plaintiff Davila was terminated on May 21, 2024 in violation of Defendant's policy of "no tolerance for any type of violence."

62.     Plaintiff was not, in any way, shape, or form, violent in any capacity, and Defendant's stated reason for termination is wholly pretextual.

**Plaintiff Noelia Beltran**

63.     Plaintiff Beltran is a Black woman who was subjected to similar treatment based on race, her gender, and her body.

64.     Plaintiff Beltran had been working for Defendant for roughly two years.

6

65.     Plaintiff Beltran is a Puerto Rican woman with curly hair.

66.     Plaintiff Beltran was harassed because she is Puerto Rican.  If she made an error at work, or was running late because of traffic delays, managers would send Plaintiff a Puerto Rico flag emoji.  Other times, managers directly claimed that she was doing something wrong because she is Puerto Rican.

67.     Plaintiff Beltran is plus sized and was required to wear all black at work.

68.     When Plaintiff Beltran would wear a crop top, Ms. Chahir would reprimand her, and tell her she cannot wear it despite other women being allowed, and even being encouraged to, wear crop tops.

69.     Ms. Chahir simply did not want someone of Plaintiff Beltran's body size to wear a crop top.

70.     Ms. Chahir made this known to others, including another manager, Humberto.

71.     Humberto confided in Plaintiff Beltran that Ms. Chahir would make fun of her, call her fat, and make fun of her outfits.

72.     At one point, Ms. Chahir even gave Plaintiff Beltran information for a plastic surgeon.

73.     In the final months of her employment, Plaintiff Beltran often waited over four weeks to receive her pay checks, and often had her paychecks bounce.

74.     Plaintiff Beltran was never given a breakdown on her tip credits or on tip pooling.

75.     Plaintiff Beltran would be given a stack of cash stapled to a sticky note, with no breakdown, and received her checks without signing anything to confirm that her check was received.

76.     Plaintiff Beltran was given her cash tips without any breakdown.

77.     On Easter 2023, Easter Miriam Garcia collected all the cash tips and Plaintiff

Beltran never got her cash tip.  Plaintiff Beltran was still fairly new at the establishment at the time, when she mentioned it to Ms. Garcia, Ms. Garcia said she had to figure out how she was going to split it among the staff that worked that day.

78.    Plaintiff Beltran also complained about tip pooling, late payments, and bounced checks as late as April 12, 2024 and May 14, 2024 via text message.

79.    Ms. Chahir manages another establishment owned by Defendant Licul, and told Plaintiff Beltran that she received a percentage of the tips earned by Skinny Cantina employees.

80.    Ms. Chahir also bullied Skinny Cantina employees, including Plaintiff Beltran, about their bodies and their attire.

81.    Ms. Chahir would gossip about employee's weight and body shape, including Plaintiff Beltran's, saying that she was fat.

82.    Other managers covered for Ms. Chahir, saying that she was a 'matron,' and claimed that she deserved a royalty in the form of collecting some of the Skinny Cantina employee's tips.

83.    Plaintiff complained about this and other unfair practices.

84.    For example, Plaintiff complained about her paychecks bouncing.  Each time Plaintiff complained, she was taken off the schedule and not given shifts.

85.     Plaintiff Beltran was told that she would have her pay withheld or diminished if a customer returned a dish or drink.

86.    Plaintiff Beltran was forced to add "admin fees" to customers' bills, or it would be withheld from her paycheck.

87.    Plaintiff Beltran's W2 reported inaccurate amounts of money paid to her.

88.    Plaintiff Beltran complained throughout early 2024 about inaccurate pay practices, listed above, and about the discrimination and harassment she faced from Ms. Chahir.

89.    On May 21, 2024, Plaintiff Beltran again complained about not getting paid on time, and was terminated three hours later.

90.    Plaintiff was terminated on May 21, 2024 and asked to pick up her paycheck on May 24, 2024.

91.    Plaintiff Beltran, like Plaintiff Davila, was terminated in violation of Defendant's policy of "no tolerance for any type of violence."

92.    Plaintiff was not, in any way, shape, or form, violent in any capacity, and Defendant's stated reason for termination is wholly pretextual.

93.    Plaintiff Beltran was only terminated because she complained about Defendants' illegal wage and hour practices and because she complained about gender, race, and body size discrimination.

**Plaintiff Hannah Samuels**

94.    Plaintiff Samuels is a full figured curvy Black woman.

95.    Early in her employment, Plaintiff Samuels worked with a manager named Ariana, who would refer to all the female staff as "girls" creating an awkward air.  Plaintiff Samuels felt that Ariana was trying to establish herself as the mother of the restaurant and carrier herself like a pimp.

96.    Ariana would make false claims about Plaintiff's work ethic to embarrass and harass her.

97.    Specifically, Ariana would comment on Plaintiff's hair, telling her to 'fix it' and straighten it.

98.    Plaintiff Samuels worked with Humberto.

99.    Humberto would often speak to Plaintiff Samuels in Spanish to only laugh and correct himself by saying he "forgot" she doesn't speak Spanish.

100.    On September 25, 2023, Plaintiff Samuels noticed a discrepancy in her scheduling, and called Humberto to inquire.

101.    Humberto dismissed her and said that she was 'too slow' to work on Sundays and worked better when the "promoter that has a Black crowd" was there.

102.    Plaintiff Samuels shift was given to a Hispanic woman, Niccola.

103.    Huberto continued to favor Niccola over Plaintiff Samuels, and gave Niccola extra shifts while telling Plaintiff that work was slow and there were no shifts for her.

104.    Niccola would brag that she would 'no call no show' when she was not paid on time, but Plaintiff Samuels was threatened with termination if she even inquired about time off.

105.    In December 2023 and January 2024, Plaintiff Samuels began to experience bouncing checks and late payments from Defendants.

106.    Plaintiff told Humberto about this, and, as well, inquired about the $10 deposit fee at TD bank.

107.    Humberto dismiss Plaintiff Samuels' concerns and ignored her.

108.    Plaintiff Samuels continued to complain about payment through March 2024.  On March 25, 2024 Plaintiff complained to Humberto that the bank continued to reject Defendants' checks and that TD bank was concerned as this is a "continuum."

109.    TD bank was marking the checks as fraudulent because of previous bounced checks.

110.    In fact, Plaintiff Samuels had encountered this issue many times and had written Miriam on November 29, 2023, December 1, 2023, March 8, 2024, March 9, 2024, March 25, 2024, April 11, 2024, May 13, 2024, and May 15, 2024 about bounced checks, late checks, and other fees related to her paychecks.

111.    On April 4, 2024, Plaintiff questioned Humberto when her checks would be

available as they were due, but Humberto only responded that they had not arrived yet but provided no pay date.

112.    Plaintiff Samuels followed up on this on April 8, 2024 as the checks were already a week late, and Humberto said they would be there the next day.

113.    By April 21, 2024, Plaintiff Samuels still had not been paid.

114.    Humberto told Plaintiff Samuels there was still no money in the business account but told Plaintiff Samuels she could work that weekend because a Black promoter would be at the restaurant.

115.    Plaintiff Samuels later worked on May 1, 2024 during a televised fight that drew in business.

116.    Miriam, a manager, did not put Plaintiff Samuels' Saturday tips in for that weekend.

117.    Plaintiff Samuels then told Miriam, on May 11, 2024, that she can no longer afford a baby sitter because she is not being paid by Defendants.

118.    On May 21, 2024, Plaintiff Samuels was removed from group messaging apps with Defendants and Defendants' employees.  Plaintiff Samuels questioned Humberto and Miriam about this.

119.    Plaintiff Samuels directed stated to Miriam, via email, that she felt her job was in jeopardy because she spoke out about the checks.

120.    On May 24, 2024, Plaintiff Samuels reported to work and was rejected at the door, and was told that her employment ended because she was "violent."

121.    The security guard tasked with this was confused as well as he had never seen Plaintiff Samuels act violently.

122.    Other employees, including a Hispanic woman named Eileen, was drunk at work and struck a manager, but no action was taken against her.

123.    Humberto then told Plaintiff Samuels he's sorry about the way he treated her in the beginning because Ariana and Miriam talked so badly about her.

124.    Plaintiff Samuels was also subjected to extreme sexual harassment.

125.    Ms. Chahir would frequently question Plaintiff Samuels about her sex life.

126.    Ms. Chahir frequently demanded that Plaintiff Samuels wear revealing clothes over Plaintiff's objections that it was not appropriate for her body size.

127.    Plaintiff Samuels complained that the clothing Ms. Chahir demanded they wear put them at risk of being groped or harassed by male customers.

128.    A kitchen manager, Jeff, once asked Plaintiff Samuels "so how do you take dick?" when she stated she does not eat beef.

129.    Jeff has also frequently called Plaintiff Samuels a "beautiful Black woman" despite her asking him not to because it makes her uncomfortable.

130.    Jeff has questioned Plaintiff Samuels about "who she's going on a date with" when she changed her style or look.

131.    A bar manager, Miguel, often commented about Plaintiff Samuels breasts and buttocks in a sexual, harassing, and offensive manner.

**Plaintiff Aminata Bamba**

132.    Plaintiff Bamba began her employment with Defendants in June 2021.

133.    Beginning in 2022, Plaintiff began experiencing increased harassment by manages and coworkers.

134.    Plaintiff felt that, as a Black woman, she was constantly being scrutinized and disrespected as compared to non-Black coworkers.

135.    Defendants' managers often accused Ms. Bamba of stealing despite no evidence to suggest that she had done so.

136.    Stealing from one's employer is a significant and serious allegation and act.  It is completely unreasonable to believe that Defendants would continue to employ someone they knew was a thief.  The allegations against Plaintiff Bamba were and are unfounded, hence why no action was ever taken against her.

137.    Defendants control another restaurant, "Panda Harlem," that offers discounts to employees.

138.    Employees, that is, who are not Black.

139.    Defendants would demand that Ms. Bamba have a reservation to enter the restaurant despite i) not demanding this of customers, and ii) open seats being available.

140.    Defendants would not allow Ms. Bamba to use her employee discount.

141.    Other coworkers, who were not Black, were allowed in without reservations and were offered discounts on their bills.

142.    In 2023, Plaintiff Bamba began complaining about Defendants' frequent failures to make timely payments of wages.

143.    When Ms. Bamba complained, she was ignored and Defendants continued to delay payments.

144.    Eventually, Defendants terminated Plaintiff because she complained about the discrimination and failure to pay wages.

145.    Plaintiff Bamba had to work with the same Miguel that harassed Plaintiff Samuels, and he would often give her dirty looks, talk about her negatively in Spanish, and would try to exclude her from working at the bar when he was working.

146.    Plaintiff Bamba complained to other employees that she felt she was being targeted and that her job was at risk, but those other employees did not share the sentiment, and felt that their jobs were not at risk.

13

147.    Those other colleague were light skinned Hispanic women, and were not Black like the Plaintiffs.

148.    Plaintiff Bamba observed a 'whitewashing' at Skinny's Cantina that sought to remove all of the Black employees with light skinned Hispanic women.

**Wage and Hour Violations**

149.    Plaintiffs and Class Members frequently were not paid in a timely manner, often having their paychecks withheld for three to four weeks, sometimes more.

150.    Plaintiff and Class Members were not told what the "tip pool" breakdown was. Plaintiff and Class Members were also often not given their proper tips.

151.    Defendants openly acknowledge that employees who do not customarily receive tips were, in fact, receiving tips, a violation of 29 U.S.C. § 203(m) and New York Labor Law 196-d.

152.    Plaintiff and Class Members were not told the breakdown on their cashed tips.

153.    Defendants did not breakdown the value of tips shared with Plaintiffs and only paid them in a lump sum.

154.    Plaintiff and Class Members would deposit paychecks given to the by Defendants, but those checks would sometimes bounce and Plaintiff and Class Members were not paid for extended periods of time.

155.    Restaurant employees are "manual laborers" under New York Labor Law Section 190(4) and must be paid ever week and no later than seven (7) days after the pay period ends.

156.    Plaintiffs and Class Members frequently were not paid in a timely manner by Defendants.

## CAUSES OF ACTION
### FIRST CLAIM

**Race Discrimination under 42 U.S.C. 1981 and the New York City Human Rights Law**

157.    Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

158.    Under 42 USC 1981, Americans are afforded the right to be free from discriminatory animus.

159.    The New York City Human Rights Laws track and expand Title VII, which, in turn, relies on the same analysis as 42 USC 1981.  Specifically, the New York City Human Rights Law allows for more liberal pleading and proof standards than under Title VII.

160.    The New York City Human Rights Law also allows for individual liability.

161.    Plaintiffs were and are Black.

162.    Plaintiffs were treated differently than non-Black employees.

163.    Plaintiffs were subjected to negative commentary about Black people, including being told that they steal, that they are aggressive, and that they were not the 'right' customer base for Skinny's Cantina.

164.    Plaintiffs were wrongfully accused of stealing, wrongfully accused of being violent, and were targeted and stereotyped because they are Black.

165.    As such, Defendants intentionally and willfully violated Plaintiff's right to be free from discrimination, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

### SECOND CLAIM

**Retaliation under 42 U.S.C. 1981 and the New York City Human Rights Law**

166.    Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

167.    Under 42 USC 1981, Americans are afforded the right to be free from discriminatory animus.  Likewise, they are afforded protection from retaliation when they complain about race discrimination.

168.    The New York City Human Rights Laws track and expand Title VII, which, in turn, relies on the same analysis as 42 USC 1981.  Specifically, the New York City Human Rights Law allows for more liberal pleading and proof standards than under Title VII.

169.    The New York City Human Rights Law also allows for individual liability.

170.    Plaintiffs explicitly complained about being treated differently based on race.

171.    When Plaintiffs complained, they had their shifts diminished and were given less hours to work.

172.    Plaintiffs were subsequently terminated as a product of their complaints.

173.    As such, Defendants intentionally and willfully violated Plaintiff's right to be free from retaliation, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## THIRD CLAIM

### Gender/Sex Discrimination under the New York City Human Rights Law

174.    Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

175.    Under Title VII, it is illegal for an employer to discriminate against an employee on the basis of gender/sex.

176.    The New York City Human Rights Law tracks and expands Title VII. Specifically, the New York City Human Rights Law allows for more liberal pleading and proof standards than under Title VII.

177.    The New York City Human Rights Law also allows for individual liability.

16

178.    Plaintiffs are all women and were treated differently based on this protected class.

179.    Plaintiffs were subjected to harassing commentary about their appearance, and, as well, subjected to sexual and offensive commentary.

180.    As such, Defendants intentionally and willfully violated Plaintiffs' right to be free from discrimination, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## FOURTH CLAIM

**Retaliation based on Gender/Sex under the New York City Human Rights Law**

181.    Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

182.    Under The New York City Human Rights Law, it is illegal for an employer to discriminate against an employee on the basis of gender/sex.

183.    Under The New York City Human Rights Law, it is illegal for an employer to retaliate against an employee who raises concerns about mistreatment and discrimination on the basis of gender/sex in the workplace.

184.    The New York City Human Rights Law tracks and expands Title VII. Specifically, the New York City Human Rights Law allows for more liberal pleading and proof standards than under Title VII.

185.    The New York City Human Rights Law also allows for individual liability.

186.    Plaintiffs are women who were discriminated against because of this protected status.

187.    Plaintiffs complained about this discrimination frequently to managers and coworkers.

188.    When Plaintiffs complained, they were threatened with having their hours reduced and, ultimately, were terminated for a pretextual reason.

189.    As such, Defendants intentionally and willfully violated Plaintiffs' right to be free from retaliation, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## FIFTH CLAIM

**Harassment based on body size in violation of the New York City Human Rights Law**

190.    Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

191.    Under the New York City Human Rights Law, it is illegal to directly or indirectly express that an individual will, or may, be treated differently because of their body size.  It is also illegal to use offensive or harassing language when referring to an employee's body size.

192.    Defendants' senior employees often treated Plaintiffs differently based on their body size, by forcing them to weak clothes that did not adequately fit, by allowing Plaintiffs to work in an unsafe environment that invited extreme sexual harassment by customers, and by threatening Plaintiffs with write ups if they did not comply with the unreasonable demands.

193.    Defendants also referred to Plaintiffs as "fat" and otherwise bullied them for their body size.

194.    As such, Defendants intentionally and willfully violated Plaintiffs' right to be free from discrimination, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## SIXTH CLAIM

**FLSA Violations and New York Labor Law Violations, late payments**

195.    Plaintiffs and Class Members hereby realleges and incorporates each and every

allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

196.    At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 USC 206(a) and 207(a).    Further, Plaintiff and Class Members are covered individuals within the meaning of the FLSA, 29 USC 206(a) and 207(a).    Plaintiff and Class Members were employed by Defendants under the meaning of New York Labor Law Sections 2 and 651.

197.    Under the FLSA, Defendants were required to make timely payments and not to unreasonably delay those payments.

198.    Defendants frequently delayed Plaintiffs and Class Member's payments for no good or justifiable reason, often for multiple weeks.

199.    New York Labor Law 191 requires that "not later than seven calendar days after the end of the week in which the wages are earned," a restaurant employee must be paid.

200.    Plaintiffs and Class Members frequently went two, three, or four weeks without being paid the accurate amount of wages in a timely manner.

201.    Often, Plaintiffs and Class Members were not paid at all as Defendants checks would bounce because Defendants did not keep sufficient money in the business accounts.

202.    As such, Defendants intentionally and willfully violated Plaintiffs' federal and New York State Rights, and owes Plaintiff all front pay, back pay, liquidated damages, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

### SEVENTH CLAIM

**FLSA Violations and New York Labor Law Violations, failure to pay wages**

203.    Plaintiffs and Class Members hereby realleges and incorporates each and every

allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

204.    At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 USC 206(a) and 207(a).   Further, Plaintiff and Class Members are covered individuals within the meaning of the FLSA, 29 USC 206(a) and 207(a).  Plaintiff and Class Members were employed by Defendants under the meaning of New York Labor Law Sections 2 and 651.

205.    Under the Fair Labor Standards Act and the New York Labor Law, an employer is allowed to pay an employee under the minimum wage if they receive a tip credit.

206.    29 U.S.C. § 203(m) demands that all tipped employees, who are paid under the minimum wage, must be paid at least the minimum wage by receiving tips.

207.    Employees who are not customarily tipped <u>cannot</u> take a portion of the tip pool allotted to tip exempt employees.

208.    Defendants frequently violated this and allowed non-tip employees to share in the tip pool.

209.    According to 29 C.F.R. § 531.52, "the practice in which tips are shared with employees who do not "customarily and regularly" receive tips is unlawful, even if the employee's non-tip wages meet or exceed the minimum wages." *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F.Supp.2d 545, 561 (S.D.N.Y. 2013).

210.    As such, Defendants intentionally and willfully violated Plaintiffs' federal and New York State Rights, and owes Plaintiff all front pay, back pay, liquidated damages, emotional distress damages, punitive damages, attorney fees, costs, and expenses

## EIGHTH CLAIM

**Retaliation for complaining about FLSA Violations and New York Labor Law Violations**

211.    Plaintiffs hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

212.    At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 USC 206(a) and 207(a).    Further, Plaintiff and Class Members are covered individuals within the meaning of the FLSA, 29 USC 206(a) and 207(a).    Plaintiff and Class Members were employed by Defendants under the meaning of New York Labor Law Sections 2 and 651.

213.    Under the FLSA and the New York Labor Law, an employer cannot retaliate against employee who complains about illegal pay practices.

214.    Additionally, under New York Labor Law 215, an employer cannot retaliate against an employee "because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, or any order issued by the commissioner."

215.    Plaintiffs complained about the unfair and illegal wage and hour violations, violations of the FLSA and New York Labor Law, and they were subsequently terminated.

216.    Plaintiffs were only terminated as a result of their complaints about the wage and hour violations.

217.    As such, Defendants intentionally and willfully violated Plaintiffs' right to be free from retaliation, and owes Plaintiff all front pay, back pay, emotional distress damages,

punitive damages, attorney fees, costs, and expense.

## NINTH CLAIM

### Breach of Contract

218.    Plaintiff Davila realleges and incorporates each and every allegation contained in paragraphs 1 through 156 with the same force as though separately alleged herein.

219.    Plaintiff entered into an employment contract with Defendants.

220.    Defendants promised to pay Plaintiff Davila commissions.

221.    Defendants did not pay Plaintiff Davila her commissions and have no justifiable excuse in failing to do so.

222.    The commissions were owed and promised wages and income, and were not a discretionary product of Plaintiff's at will employment.

223.    As such, Defendants owe Plaintiff Davila all payments and commissions owed to her.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  For the first cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

B.  For the second cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

C.  For the third cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

D. For the fourth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

E. For the fifth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

F. For the sixth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

G. For the seventh cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

H. For the eighth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

I. For the ninth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

J. Pre and post judgment interest;

K. Designation of this as a class and collective action pursuant to Fed. R. of Civ. Pro. 23; and

L. For such other and further relief as the Court deems just and proper.

Dated:
June 27, 2024

**HARMAN GREEN PC**

By: _____

Walker G. Harman, Jr.
140 Broadway, Fl 46
New York, NY 10005
(646) 248-2288
wharman@theharmanfirm.com
erichardson@theharmanfirm.com
*Attorneys for Plaintiff*