USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/2/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Dominique Davila, Hannah Samuels, Noelia Beltran, and Aminata Bamba, on behalf of themselves and all other similarly situated employees,

Plaintiffs,

-against-

Skinny River Inc, d/b/a Skinny's Cantina on the Hudson, Joseph Licul, and Ibtissam Chahir,

Defendants.

24 Civ. 4871 (AT) (VF)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiffs, Dominique Davila, Hannah Samuels, Noelia Beltran, and Aminata Bamba, allege that Defendants, Skinny River Inc, d/b/a Skinny's Cantina on the Hudson ("Skinny's"), Joseph Licul, and Ibtissam Chahir, violated their rights under 42 U.S.C. § 1981, the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8 *et seq.*, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and New York Labor Law ("NYLL"), in connection with their employment at Skinny's. *See generally* Third Amended Complaint ("TAC"), ECF No. 49. Defendants move to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). *See* Mem., ECF No. 53; *see also* Opp., ECF No. 54; Reply, ECF No. 55. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND[1]

Plaintiffs are four Black women who formerly worked at Skinny's: Dominique Davila, Noelia Beltran, Hannah Samuels, and Aminata Bamba. *See generally* TAC. Defendants are

[1] For the purposes of this motion, the Court accepts as true all well-pleaded facts in the TAC. *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).

Skinny's, a Mexican restaurant; Joseph Licul, the owner and operator of Skinny's[2]; and Ibtissam Chahir, a manager employed by Skinny's and Licul. *Id.* ¶¶ 10–12.

Plaintiffs bring several discrimination and wage claims. Plaintiffs each bring claims of race discrimination, and Aminata Bamba brings a claim of race-based retaliation under 42 U.S.C. § 1981 and the NYCHRL (First and Second Claims).[3] *See id.* ¶¶ 193–209. Dominique Davila and Hannah Samuels also allege gender-based discrimination and retaliation claims under the NYCHRL (Third and Fourth Claims).[4] *See id.* ¶¶ 210–25. Davila, Samuels, and Noelia Beltran allege a NYCHRL claim for harassment based on body size (Fifth Claim). *See id.* ¶¶ 226–32. Beltran separately alleges discrimination based on national origin (Twelfth Claim), *see id.* ¶¶ 276–83, and Bamba alleges religious discrimination claim under the NYCHRL (Eleventh Claim), *see id.* ¶¶ 283–90.

In addition, Plaintiffs allege numerous violations of the FLSA and NYLL, including for (1) late payments (Sixth Claim), *id.* ¶¶ 233–240; (2) failure to pay tips and commissions (Seventh Claim), *id.* ¶¶ 241–51; (3) failure to pay overtime wages (Eighth Claim), *id.* ¶¶ 252–59; (4) retaliation for complaining about FLSA and NYLL violations (Ninth Claim), *id.* ¶¶ 260–66; and (5) unlawful deduction of wages (Tenth Claim), *id.* ¶¶ 267–75.

The Court reviews each Plaintiff's factual allegations in turn.

I. <u>Dominique Davila</u>

Dominique Davila is a Black woman who began working at Skinny's in 2021. *See id.* ¶ 15. Early in her employment, Chris, a general manager, told Davila that he would "ea[t] [her]

[2] Joseph Licul is the owner and operator of Skinny's. *Id.* ¶ 168. He exercised ultimate control over Skinny's pay practices and Plaintiffs' employment. *Id.* ¶ 169; *see id.* ¶¶ 174–76 (stating that managers reported to Licul and that Licul made firing decisions).

[3] Davila initially brought a claim for retaliation against her complaints about racial discrimination but later dropped this claim. *See* TAC at 20; Opp. at 15.

[4] Beltran initially brought gender discrimination and retaliation claims in the TAC but later dropped these claims. *See* TAC at 20–21; Opp. at 13-14.

up in that dress." *Id.* ¶ 16. Chris "frequently made inappropriate, sexual comments, such as offering oral sex to her while at work." *Id.* ¶ 19. After Davila "rejected and ignored Chris," a lead server and one of Davila's supervisors, Ariana,[5] fired Davila. *Id.* ¶ 21. After Davila stated that she would be reaching out to a lawyer, Skinny's hired her back. *Id.* ¶¶ 23–24. However, Chris' "offensive comments persisted." *Id.* ¶ 25.

In October 2022, customers physically attacked Davila during one of her shifts. *Id.* ¶ 26. Chris then fired Davila for "violence." *Id.* ¶ 26. After security footage showed that Davila had not been violent, Skinny's rehired her. *Id.* ¶ 27. Shortly thereafter, Davila began working at another establishment; learning of this, Chris called that establishment and wrongfully claimed that she had been terminated for stealing. *Id.* ¶ 29. Then, during one of her shifts at Skinny's in March 2023, a disgruntled customer spat on her. *Id.* ¶ 30. After Davila told Chris what happened, he blamed her for the incident and responded, "would it make you feel better if I spit on you?" and "offer[ed] the question in a sexual manner." *Id.* ¶¶ 31–32. Although Davila reported Chris' conduct to the human resources manager, Miriam Garcia, Garcia "ignored her concerns" at first. *Id.* ¶ 33. Only after Davila continued to complain about Chris did Garcia state that she would look for a new position for Davila. *Id.* ¶ 34. Garcia eventually told Davila that Chris was "no longer employed" at Skinny's. *Id.* ¶ 35.

Davila frequently inquired about the tip pooling procedure, even though "[c]oworkers told [her] not to question management about the tip pooling system." *Id.* ¶¶ 39–43. Davila states that Ariana would become "greatly irritated" if Davila asked about tipping procedures. *Id.* ¶ 42. Once, a few days after Davila first questioned Ariana about tip pooling, Ariana dismissed Davila from her shift early and rejected Davila's plea to stay because of the transportation expenses

[5] Plaintiffs do not provide the last name of several of the managers named in their complaint.

incurred for her now-truncated shift. *Id.* ¶ 43. Ariana also told Davila she would be written up if she questioned the "admin fees" applied to customers' checks. *Id.* ¶ 44.

During the summer and fall of 2023, Skinny's "saw a reorganization," in which the management team added two supervisory positions. *Id.* ¶ 45. One of the new managers, Ibtissam Chahir, immediately began receiving tips from the tip pool, even though she was a manager. *Id.* ¶ 47. Chahir justified her inclusion in the tip pool saying, "it's Joe's restaurant and he can tip me if he wants." *Id.* ¶ 46. Other members of Skinny's management claimed that Chahir was a "matron" who "deserved a royalty in the form of collecting some of the Skinny['s] employee's tips." *Id.* ¶ 89.

In October 2023, another new manager, Humberto, told Davila that Ariana wanted to fire certain employees, including Davila because she "complains and voices her opinions" and because management was "concerned about 'her look.'" *Id.* ¶ 49. Humberto also told Davila that Ariana wanted to fire Beltran because she was "too fat," Samuels because she was "scared of her," and Bamba because she "steals." *Id.* ¶ 48. About that same time, Chahir also commented that "she wanted to change Skinny's . . . customer base, which is predominantly Black, and frequently made negative comments about people who were Black and/or 'plus sized.'" *Id.* ¶ 50. According to a promoter who worked with Chahir at another restaurant, Chahir "did not want [B]lack servers, and that, for that reason, [Chahir] would change Black servers['] working days." *Id.* ¶ 66. On a separate occasion, another Skinny's manager, Elvis, told Davila that her hair style was "too black" and "made her look angry" and that Skinny's "hair preference is 'straightened.'" *Id.* ¶ 67.

In spring 2024, managers insisted that Davila "wear a mini skirt during a work event" over her objections that "a mini skirt would [rise] on her because of her body shape and that it

would be incredibly revealing." *Id.* ¶¶ 52–54. She then complained to Humberto that she felt that she was undervalued because of her weight. *Id.* ¶ 56.

At that point in 2024, Davila had not received her latest paycheck in over two and half weeks. *Id.* ¶ 55. On May 21, 2024, she complained via WhatsApp that "management does not value staff," "staff have to deal with 'bounced checks,'" and staff "have 'been without pay for weeks.'" *Id.* ¶ 61. Davila also complained that her "schedule was taken" because she "expressed concerns about pay and discrimination." *Id.* ¶ 62. That same day, Skinny's fired her. *Id.* ¶ 63. Davila states that the purported explanation for her termination was that she had been violent, but she was "not, in any way, shape, or form, violent." *Id.* ¶ 64.

II. <u>Noelia Beltran</u>

Noelia Beltran is a Black woman who had been working at Skinny's for about two years before she was fired in May 2024. *Id.* ¶¶ 68–69, 97. Beltran alleges that she was "harassed because she is . . . dark skinned and Puerto Rican." *Id.* ¶ 71. She states that if she "made an error at work, or was running late because of traffic delays, managers would send [her] a Puerto Rican flag emoji to mock her." *Id.* ¶ 71. On at least one other occasion, a manager directly claimed that she was doing something wrong "because she is Puerto Rican." *Id.*

Like Davila, Beltran is also "plus sized." *Id.* ¶ 72. If she chose to wear a crop top, Chahir "would reprimand her, and tell her she cannot wear it despite other women being allowed, and even being encouraged to, wear crop tops." *Id.* ¶ 73. In fact, Chahir told Beltran that "she could not wear the same outfits as coworkers because she was 'overweight.'" *Id.* ¶ 75.[6] Humberto told Beltran that Chahir "would make fun of her, call her fat, and make fun of her outfits." *Id.* ¶ 78. Humberto also said that Chahir told him that she "excluded [Beltran] from

[6] It appears from context that it was Chahir made this comment, although the complaint does not explicitly specify who at Skinny's told this to Beltran. *See* TAC ¶ 75.

helping servers with parties due to her weight." *Id.* ¶ 76–77. At one point, Chahir even gave Beltran information about a plastic surgeon. *Id.* ¶ 79.

As to her wage claims, Beltran states that Skinny's did not inform her how the tip pool operated, nor did it provide her with a breakdown of tip distribution. *See, e.g., id.* ¶¶ 81–83, 180, 183–93. And, on at least one occasion, Easter of 2023, Beltran never did not receive any cash tips for her shift. *See id.* ¶ 84. After she complained to Garcia in human resources, Garcia merely stated that "she had to figure out how she was going to split it among the staff that worked that day," without paying Beltran. *Id.* In addition, management told Beltran that, as a policy, money would be "withheld from her paycheck" if she refused to add "admin fees" to customers' bills. *Id.* ¶ 93. In her final months of employment, Beltran "often waited over four weeks to receive her pay checks" and "had her paychecks bounce." *Id.* ¶ 80.

In April and May of 2024, Beltran lodged numerous complaints regarding tip and payment practices, although the complaint does not specify to whom. *Id.* ¶ 85. She claims that "[e]ach time [she] complained, she was taken off the schedule and not given shifts." *Id.* ¶ 91. Like Davila, Beltran complained about not getting paid on May 21, 2024. *Id.* ¶ 96. Three hours later, Skinny's fired her. *Id.* ¶ 97. And as with Davila, Skinny's claimed that it fired Beltran because she was violent, even though she was not. *Id.* ¶¶ 98, 100.

III. <u>Hannah Samuels</u>

Hannah Samuels is a "full figured curvy Black woman" who worked at Skinny's. *Id.* ¶ 102. Early in her employment, Ariana told Samuels to "fix" and "straighten" her hair. *Id.* ¶ 105. On September 25, 2023, Samuels noticed a discrepancy in her scheduling and called Humberto to inquire; in response, Humberto said that Samuels "worked better when the 'promoter that has a Black crowd'" was there. *Id.* ¶ 109; *see also id.* ¶ 123 (assigning Samuels a

shift "because a Black promoter would be at the restaurant"). Samuels' shift was assigned to a "lighter skinned Hispanic woman, Niccola," to whom Humberto continued to give "extra shifts," all while telling Samuels that there were "no shifts" for her. *Id.* ¶¶ 110–11. Niccola, moreover, would "brag" that she could refuse show up "without repercussion," but Samuels was "threatened with termination if she even inquired about time off." *Id.* ¶ 113.

In addition, Samuels alleges that members of Skinny's management team subjected her to sexual harassment. *Id.* ¶ 133. For example, Chahir, who joined Skinny's as manager in the fall of 2023, *id.* ¶ 45, would "frequently question" Samuels "about her sex life" and "frequently demanded that [she] wear revealing clothes over [her] objections that it was not appropriate" and would "put them at risk of being groped or harassed by male customers," *id.* ¶¶ 134–36. A kitchen manager named Jeff "frequently" called Samuels a "'beautiful Black woman' despite her asking him not to because it makes her uncomfortable"; questioned Samuels about "who she's going on a date with" because she "changed her style"; "frequently stared at [her] breasts"; and once replied "so how do you take dick?" after Samuels stated that she does not eat beef. *Id.* ¶¶ 137–40. A bar manager, Miguel, would also comment about Samuels' "breasts and buttocks" in a "sexual . . . and offensive manner." *Id.* ¶ 141.

In about December 2023 and January 2024, Samuels' paychecks from Skinny's began to bounce. *Id.* ¶ 114. When Samuels called attention to the issue of bounced paychecks, Humberto "dismissed" her complaints and "ignored" her. *Id.* ¶ 116. In March 2024, Samuels again complained to Humberto that her bank continued to reject Skinny's checks. *Id.* ¶ 117. Samuels also wrote to Garcia on eight separate occasions from November 2023 through May 2024 about

bad checks, late checks, and other fees relating to her paychecks. *Id.* ¶ 119. By April 2024, Defendants still had not fully paid Samuels. *Id.* ¶ 122.

On May 11, 2024, Samuels told Garcia that she could no longer afford childcare because Defendants were not paying her. *Id.* ¶ 126. Not long after, on May 21, the same day Defendants fired Davila and Beltran, Defendants removed Samuels from their group messaging apps. *Id.* ¶ 127. Samuels questioned Humberto and Garcia about her removal, expressing concern that "her job was in jeopardy because she spoke about the checks." *Id.* ¶¶ 127–28. On May 24, Samuels reported to work but was rejected at the door by the security guard, who told her that she had been fired for being "violent." *Id.* ¶ 129. However, the security guard said he was "confused" because "he had never seen . . . Samuels act violently." *Id.* ¶ 130. Samuels states that another employee, a Hispanic woman, was once "drunk at work and struck a manager" but "no action was taken against her." *Id.* ¶ 131.

IV. Aminata Bamba

Aminata Bamba is a Black woman who began working at Skinny's in June 2021. *Id.* ¶¶ 144–46. Bamba alleges that as a Black woman, she was "constantly being scrutinized and disrespected as compared to non-Black coworkers." *Id.* ¶ 146. For example, Skinny's managers "often accused []Bamba of stealing despite no evidence to suggest that she had done so." *Id.* ¶ 147. Notably, despite these accusations, Skinny's did not fire Bamba until years later. *Id.* ¶ 148. When Bamba complained to other, lighter-skinned workers that she felt that she was being targeted, those employees "did not share the same negative experiences at work" and "felt that their jobs were not at risk." *Id.* ¶¶ 150–51, 161–62.

In addition, those workers reported being treated better than Bamba. For example, lighter skinned employees were offered discounts at one of Skinny's sister restaurants, Panda Harlem,

but Bamba was not. *Id.* ¶¶ 152–53. Defendants also demanded that Bamba have a reservation to enter that restaurant, even though the restaurant did not require reservations, would have open seats, and would allow Bamba's non-Black coworkers to enter. *Id.* ¶¶ 154, 156.

Bamba is Muslim, and Chahir criticized Bamba for her religion. *Id.* ¶¶ 164–65. As one example, Chahir "demanded" that Bamba wear "revealing clothing that was typical of a female providing 'bottle service' to clients and customers." *Id.* ¶ 166. When Bamba refused to do so because it conflicts with her religion, Chahir threatened to fire her. *Id.* ¶ 167.

In 2023, Bamba began complaining about Defendants' frequent failures to timely pay wages. *Id.* ¶ 157. When she complained, Defendants ignored her and continued to delay payments. *Id.* ¶ 158. Eventually, Skinny's fired Bamba. *Id.* ¶ 159.

## DISCUSSION

### I. Legal Standard

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Id*. On a motion to dismiss, the Court must draw all reasonable inferences

in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

II. Analysis

A. Race Discrimination (All Plaintiffs)

Plaintiffs allege race discrimination in violation of 42 U.S.C. § 1981 and the NYCHRL.

"To establish a claim under 42 U.S.C. § 1981, a plaintiff must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000). Discrimination in employment falls within the scope of § 1981. *See Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004) (explaining that § 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment"). "Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981." *Id.* at 225.[7]

To sustain a *prima facie* case of discrimination under federal law, a plaintiff must show that (1) she is a "member of a protected class," (2) "she was qualified for the position she sought," (3) "she suffered an adverse employment action," and (4) she "can sustain a *minimal* burden showing facts suggesting an inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (emphasis in original). "[I]n the initial phase of . . . litigation," a plaintiff "need not give plausible support to the ultimate question of whether

[7] Relevant differences include that claims under § 1981 need not be asserted within the 180 or 300-day period applicable to Title VII claims and that unlike Title VII claims, § 1981 claims are cognizable against individuals. *See Patterson*, 375 F.3d at 225–26.

the adverse employment action was attributable to discrimination"; rather, she "need only give a plausible support to a minimal inference of discriminatory motivation." *Id.*

To state a claim for discrimination under the NYCHRL, a plaintiff must plausibly allege that they have been treated "less well" because of a protected characteristic. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 110 (2d Cir. 2013). Federal civil rights statutes "serve only 'as a *floor* below which the [NYCHRL] cannot fall.'" *Id.* (emphasis in original) (quoting *Loeffler v. Staten Island Univ. Hosp*., 582 F.3d 268, 278 (2d Cir. 2009)). District courts must construe "the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Id.* at 109 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)); *see Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 13 (2d Cir. 2013) (explaining that the NYCHRL is "intended to provide a remedy reaching beyond those provided by the counterpart federal civil rights laws").

With respect to Plaintiffs' § 1981 claims, Plaintiffs, who are all Black employees, have plausibly alleged that Skinny's scheduled Black servers for different and fewer shifts. *See, e.g.*, TAC ¶¶ 65, 98–99, 109–12, 123, 161–63. They have, therefore, plausibly alleged an adverse employment action. *See, e.g.*, *Amador v. All Foods, Inc.*, No. 12 Civ. 1715, 2013 WL 1306305, at *5 (E.D.N.Y. Feb. 20, 2013) (recognizing on a motion to dismiss that shift changes may constitute adverse employment actions), *report and recommendation adopted*, 2013 WL 1282353 (E.D.N.Y. Mar. 27, 2013).

Defendants argue that "plaintiffs failed to plead sufficient facts to meet the minimal requirements for a discrimination claim," Mem. at 3, but the complaint is replete with allegations permitting a reasonable inference of discrimination with respect to shift scheduling. "An inference of discrimination can arise from circumstances including, but not limited to, 'the

employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (citation omitted). In this case, one Skinny's manager, Chahir, explicitly stated that she wanted to change Skinny's predominantly Black customer base, would frequently make negative comments about Black people, and told a promoter that she did not want Black servers. *See* TAC ¶ 50, 66; *see also id.* ¶¶ 76–77 (factual allegations indicating that Chahir had control over Plaintiffs' work schedules). These allegations permit an inference of discrimination with respect to all Plaintiffs, who are similarly situated. Tellingly, once, after noticing a discrepancy in her schedule, Samuels asked Humberto, another manager, why she was not scheduled for a shift. *Id.* ¶ 108. Humberto responded that she "worked better when the 'promoter that has a Black crowd'" was there and ultimately assigned Samuels' shift to a "lighter[-]skinned Hispanic woman." *Id.* ¶¶ 109–11; *see also id.* ¶ 123 (assigning Samuels a shift because "a Black promoter would be at the restaurant").

Other comments made by Skinny's management further support an inference of racial discrimination with respect to the terms and conditions of Plaintiffs' employment. *See East v. Roosevelt Union Free Sch. Dist.*, No. 19 Civ. 3709, 2020 WL 13753159, at *7 (E.D.N.Y. July 31, 2020) ("[T]he Court may consider the totality of the relevant facts, including allegations of discrimination that do not rise to the level of adverse employment actions, to shed light on Defendant's motivation."). For example, Davila states that Ariana, a manager, and Garcia wanted to fire her because they were "concerned about 'her look.'" *Id.* ¶ 49. Another Skinny's manager once told Davila that her hair style was "too black" and "made her look angry" and that Defendants' "hair preference" is "straightened." *Id.* ¶ 67; *see id.* ¶ 105 (comments made to

Samuels to "fix" and "straighten" her hair). *See also Gurley v. David H. Berg & Assocs.*, No. 20 Civ. 9998, 2022 WL 309442, at *4 (S.D.N.Y. Feb. 2, 2022) ("Two other circuits and a court in this District have acknowledged the potential discriminatory intent behind comments regarding natural Black hair."). Plaintiffs further allege preferential treatment for non-Black employees in other contexts. For example, Bamba states that, unlike non-Black Skinny's employees, she was required to have a reservation to eat at and did not receive an employee discount at Skinny's sister restaurant. *See id.* ¶¶ 151–56. She also alleges that unlike her lighter-skinned coworkers, she was subject to higher scrutiny in her performance and was frequently falsely accused of stealing, despite no evidence of it. *Id.* ¶¶ 146–147, 151, 161. Samuels alleges that Niccola, the lighter-skinned Hispanic woman who was assigned some of her shifts, "openly bragged" that she could refuse to report to work when scheduled, whereas Defendants threatened to fire Samuels when she inquired about time off. *Id.* ¶ 113.

In sum, the complaint depicts an environment where management preferred lighter-skinned, non-Black employees in many aspects of employment. Considering the totality of the circumstances, and accepting Plaintiffs' allegations as true, the complaint plausibly alleges that Defendants modified and limited Plaintiffs' work schedules because they were Black. Plaintiffs have, therefore, stated a claim for § 1981 discrimination. And because they have stated a federal discrimination claim, they have necessarily stated a NYCHRL claim. *See Taylor v. City of New York*, 207 F. Supp. 3d 293, 304 (S.D.N.Y. 2016).

B. Gender Discrimination (Davila and Samuels)[8]

Davila and Samuels may also proceed with their gender discrimination claims. To state a gender discrimination claim under the NYCHRL, a plaintiff need only demonstrate "she has

[8] Beltran drops her claim for gender discrimination under the NYCHRL, except to the extent it overlaps with her body size discrimination claim. *See* Opp. at 13–14.

been treated less well than other employees because of her gender." *Mihalik*, 715 F.3d at 110; *see also Mayorga v. Greenberg*, No. 22 Civ. 387, 2023 WL 6307994, at *9 (E.D.N.Y. Sept. 28, 2023) ("The NYCHRL does not have 'separate standards' for discrimination, harassment and hostile work environment claims; 'rather, there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on gender[]' . . . ." (internal quotation marks and citation omitted)). Even "a single comment that objectifies women . . . made in circumstances where that comment would, for example, signal views about the role of women in the workplace [may] be actionable." *Mihalik*, 715 F.3d at 111 (quoting *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 80 n.30 (2009)). Moreover, under the NYCHRL, and unlike in the Title VII context, a plaintiff need not allege a materially adverse employment action nor severe or pervasive conduct to state a claim. *Id.* at 114. Rather, the NYCHRL reaches all differential treatment that results in an employee to being treated less well because of a protected trait like gender. *See id*. at 110–111.

The Court rejects Defendants' claim Davila and Samuels have failed to allege facts demonstrating that they were treated less well because of their gender. *See* Mem. at 12. The complaint alleges that Davila and Samuels were subjected to explicit sexual comments, unwanted sexual advances, and other gender-based unlawful conduct.

1. Davila

Davila alleges that Chris, one of her managers at Skinny's, frequently made sexual comments directed at her. For example, early in her tenure, Chris told her that he would "ea[t] [her] up in that dress" and offered her oral sex while at work. *Id.* ¶¶ 16, 19. Later, after a customer spit on Davila, Chris asked if she would prefer for him to spit on her, offering "in a sexual manner." *Id.* ¶ 32. Repeated unwanted sexual attention and sexually charged remarks

exceed the type of petty or slight trivial inconvenience that is not actionable under the NYCHRL. *See Williams*, 61 A.D.3d at 80 & n.30; *Mihalik,* 715 F.3d at 110–111. Therefore, Davila has stated an NYCHRL gender discrimination claim.

2. Samuels

Samuels alleges that Chahir, who joined Skinny's as a manager in the fall of 2023, frequently questioned her about her sex life. *See* TAC ¶ 134. In addition, Chahir demanded she wear revealing clothes, over Samuels' objections, including that she feared the risk of being groped or harassed by male customers. *Id.* ¶¶ 135–36. Defendants argue that there is "no discriminatory motive ascribed to [this] conduct" because Samuels does not allege the type of clothing dictated and whether such clothing was a part of the uniform. Reply at 3. Not so. The complaint specifies that Chahir "demanded" she wear "revealing" clothing that could "put them at risk of being groped or harassed by male customers." *Id.* ¶¶ 134–36. This sexualized demand is linked to Samuels' gender. *See Pfeiffer v. Lewis Cnty.*, 308 F. Supp. 2d 88, 104 (N.D.N.Y. 2004) ("The references to wearing shorter dresses, lower cut attire . . . clearly can be considered to be gender-based."). Other Skinny's managers also subjected Samuels to repeated sexual commentary: Jeff, the kitchen manager, once asked her, "how do you take dick?" and frequently stared at her breasts, and Miguel, the bar manager, would comment on her breasts and buttocks in a sexual, harassing, and offensive manner. *Id.* ¶¶ 137–42.

As with Davila, this repeated sexual commentary is sufficient to state a claim for gender discrimination under NYCHRL. Accepting these allegations as true, and drawing all inferences in Samuels' favor, the Court finds that Samuels' allegations of gender discrimination under the NYCHRL are sufficient to survive a motion to dismiss.

C. Body Size Discrimination (Davila, Beltran, and Samuels)

Effective November 2023, the NYCHRL prohibits employment discrimination on the basis of height and weight. *See Harris v. City of New York*, 231 N.Y.S.3d 778, 783 (N.Y. Sup. Ct. 2025) (citing Local Law 61 of 2023). Under the amended law, an employer may consider height and weight only in limited circumstances, such as when consideration is "required by federal, state, or local law or regulation" or when city regulations have identified the job as one where the consideration of height or weight is reasonably necessary for performance of the job. *Id.* (citing Admin. Code. § 8-107(1)(g)(1)). New York state courts have applied the same pleading standard for all protected classes under the NYCHRL. *See, e.g.*, *id.*

Plaintiffs Beltran, Davila, and Samuels have stated plausible weight discrimination claims. The complaint alleges that Chahir frequently referred to employees as fat, "gossip[ed]" about their weight and body size, and "bullied" Skinny's employees about their bodies. *See, e.g.*, *id.* ¶¶ 48, 78, 79, 88, 229. At one point, Chahir even gave Beltran information about a plastic surgeon. *Id.* ¶ 79. On the facts of this complaint, this resulted in an environment where heavier women were treated "less well" because of their weight. *Mihalik*, 715 F.3d at 110. Indeed, Chahir told another manager that she would "exclude[] [Beltran] from helping servers with parties" or "take[] [her] off the schedule for certain events due to her weight." TAC ¶¶ 75–78. And Beltran states that when she wore a crop top, Chahir "would reprimand her, and tell her she cannot wear it despite other women being allowed, and even being encouraged to, wear crop tops." *Id.* ¶ 73. In fact, Chahir stated that Beltran could not wear the same outfits as coworkers precisely because she was "overweight," raising the inference of discriminatory motive. *Id.* ¶ 75; *see also Mihalik*, 715 F.3d at 110 (explaining that because the NYCHRL "is not a general civility

code," the plaintiff must still show "that the conduct is caused by a discriminatory motive" (internal quotation marks and citation omitted)).

These allegations are consistent with Defendants' treatment of other "plus sized" employees. Davila states, for example, that Ariana and Garcia expressed concern about her "look" and that Chahir, who "wanted to change [] Skinny['s] . . . [predominantly Black] customer base," "frequently made negative comments about people who were Black and/or 'plus sized,'" leading to an environment where Davila felt "undervalued" because of her weight. *Id.* ¶¶ 50, 56. In addition, Davila and Samuels allege being required to wear clothing that made them uncomfortable because of their weight. *See, e.g.*, *id.* ¶¶ 53–54 (explaining Davila's objection to wearing miniskirts because they would "rise" up because of her body), ¶ 135 ("Defendant Chahir frequently demanded that . . . Samuels wear revealing clothes over [her] objections that it was not appropriate for her body size.").

The Court finds that, taking their allegations as true and drawing all reasonable inferences in their favor, Davila, Beltran, and Samuels have plausibly alleged, based on Chahir's frequent derogatory comments about overweight and plus-sized women, that they were treated less well because of their weight. Nothing more is required to state a plausible NYCHRL claim. *See Mihalik*, 715 F.3d at 110.

D. Religious Discrimination (Bamba)

The Court finds that Bamba, who is Muslim, *see* TAC ¶ 165, has plausibly alleged a religious discrimination claim for failure to accommodate under the NYCHRL. Bamba claims that Chahir "demanded," with the threat of termination, that Bamba wear overly revealing clothing over her objection that she cannot because of her religion. *See* TAC ¶¶ 165–167. These allegations are sufficient to state a claim for failure to accommodate.

Under the NYCHRL, employers may not impose terms that require employees to violate their religious beliefs and mandates reasonable accommodations for religious practices, as long as the accommodation does not cause undue hardship to the employer's business. *See* N.Y.C. Admin. Code § 8-107(3)(a)–(b). Bamba alleges that she was required to wear certain clothes or risk being fired. *See* TAC ¶¶ 165–67. It is not apparent that Skinny's would experience undue hardship if it allowed Bamba to wear clothing that conforms to her religious beliefs. *See also id.* § 8-107(b) (defining an undue hardship as one requiring "significant expense or difficulty"). Therefore, Bamba has stated a failure-to-accommodate claim.

The Court rejects Defendants' argument that Bamba's religious beliefs were not sincere because she served alcohol, which the Muslim faith typically prohibits. *See* Mem. at 24. Not only does the Court find this fact irrelevant but also "the sincerity of an individual's belief is a question of fact not proper for determination in a motion to dismiss." *Beickert v. New York City Dep't of Educ.*, No. 22 Civ. 5265, 2023 WL 6214236, at *3 (E.D.N.Y. Sep. 25, 2023). Bamba's religious discrimination claim may proceed.

E. National Origin Discrimination (Beltran)

Beltran, a dark-skinned Puerto Rican woman, sufficiently alleges national origin discrimination. TAC ¶ 70. Defendants argue that Beltran "does not give any examples as to how she was harassed." Mem. at 25. Beltran states that on multiple occasions—for example, if she "made an error at work" or "was running late because of traffic delays"—managers would send her a Puerto Rican flag emoji to mock her. *Id.* ¶ 71. "Other times, managers directly claimed that she was doing something wrong because she is Puerto Rican." *Id.* Unlike Title VII, the NYCHRL does not require that a discriminatory environment constitute "severe or pervasive" harassment. *Williams*, 61 A.D.3d at 80. This is because the NYCHRL was passed to

"create workplaces that have zero tolerance for conduct demeaning to a worker because of protected class status." *Id.* at 76.

Because Beltran has described multiple instances of Skinny's managers making discriminatory comments directed at her because she is Puerto Rican, she has set forth more than a "petty slight or trivial inconvenience" and has plausibly alleged a NYCHRL claim for national origin discrimination. *Id.*; *cf. id.* (finding, by contrast, no liability for the defendant where comments were made on only one occasion and were not directed at the plaintiff).

F. Race-Based and Gender-Based Retaliation (Davila, Samuels, Beltran, Bamba)

With the exception of Davila, Plaintiffs have not adequately stated a retaliation claim under the NYCHRL, let alone the more stringent § 1981. To establish a *prima facie* case of retaliation under the NYCHRL, a plaintiff must show:

> (1) he or she engaged in a protected activity as that term is defined under the NYCHRL, (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the allege retaliatory conduct.

*Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 53 (2d Cir. 2025).

The complaint contains no non-conclusory facts showing that Plaintiffs engaged in protected activity within the meaning of the NYCHRL. The complaint alleges that certain Plaintiffs reported concerns about discrimination but offers few details about when or how Plaintiffs purportedly expressed these concerns, the substance of their complaints, or to whom they made their complaints. As a representative example, the complaint states that one plaintiff "was only terminated because she complained about Defendants' [pay practices] and because she complained about gender, race, and body size discrimination," *id.* ¶ 101—but introduces no facts about these purported discrimination complaints.

Although certain Plaintiffs state that they complained about discrimination, in the "absence of any details," their "generalized complaint is insufficient to allege that [they] engaged in a protected activity." *Hamilton v. Siemens Healthcare Diagnostics, Inc.*, No. 23 Civ. 7408, 2025 WL 863572, at *13 (S.D.N.Y. Mar. 18, 2025) (cleaned up); *see also Brummell v. Webster Cent. Sch. Dist.,* No. 06 Civ. 6437, 2009 WL 232789, at *6 (W.D.N.Y. Jan. 29, 2009) (considering whether a plaintiff complained of discrimination "in sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, national origin, or any other [protected] characteristic").

The one exception is Davila, who has plausibly stated a NYCHRL retaliation claim with respect to her complaints about Chris in the early tenure of her employment. Davila alleges that after Chris made repeated sexualized comments, including offering oral sex, and she rejected him, her manager fired her at Chris's request. *See* TAC ¶¶ 19–22; *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 386 (S.D.N.Y. 2002) ("Sexual harassment by an employer or supervisor is an unlawful practice, and an employee's refusal is a means of opposing such unlawful conduct."). This is sufficient to state a NYCHRL retaliation claim, assuming that Davila can prove damages, given that she was rehired, *see* TAC ¶ 24.

### G. FLSA and NYLL Wage Violations (Counts Six through Ten)[9]

#### 1. Late Payments

Both the NYLL and FLSA govern an employer's timing of payments. *See Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 353 (S.D.N.Y. 2014). Plaintiffs have plausibly alleged that, as food servers and wait staff, they are manual workers whose timing of

---

[9] Plaintiffs' wage claims are brought against Skinny's and its owner, Joseph Licul, who Defendants do not dispute is an employer under the NYLL and FLSA . *See generally* Mem. Plaintiffs do not bring their wages claims against Chahir. *See* TAC at 23–28. Accordingly, when discussing the wage claims, the Court's reference to "Defendants" is limited to Skinny's and Licul.

payments is governed by NYLL § 191(1)(a). *See Rankine v. Levi Strauss & Co.*, 674 F. Supp. 3d 57, 67 (S.D.N.Y. 2023) (noting that "cooks, wait staff, grocery store employees, . . . and pizzeria workers have been found to be 'manual workers'" under the NYLL); *Beh v. Community Care Companions, Inc.*, No. 19 Civ. 1417, 2021 WL 3914297, at *3 (W.D.N.Y. Feb. 1, 2021) (same). Under NYLL § 191(1)(a), "[a] manual worker shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned."[10]

Unlike the NYLL, "[t]he FLSA does not contain an explicit requirement that wages be paid on time, but 'courts have long interpreted the statute to include a prompt payment requirement.'" *McDonald v. H&M Fashion USA Inc.*, No. 24 Civ. 2476, 2025 WL 744014 at *2 (S.D.N.Y. Mar. 6, 2025) (quoting *Rogers v. City of Troy, N.Y.*, 148 F.3d 52, 55 (2d Cir. 1998)). The Court looks to "objective standards" to determine whether an employer's payment violates the FLSA, *Rogers*, 148 F.3d at 48, such as whether the employer's practices "stem from no legitimate business purpose, result in unreasonable payment delay, or have the effect of evading the FLSA's minimum wage or overtime requirements," *McDonald*, 2025 WL 744014, at *2.

Plaintiffs have pleaded plausible FLSA and NYLL late payment claims. Davila states that on at least one occasion, she had been waiting on her paycheck for over two weeks, *see* TAC ¶ 55, and that on May 21, 2024, she complained that staff as a whole had been "without pay for weeks," *id.* ¶ 61. Beltran, similarly, "often" waited "over four weeks" for a paycheck during her final month of employment and "had her paychecks bounce." *Id.* ¶ 80. Samuels and Bamba, too, frequently received late pay and bad checks. *See, e.g.*, *id.* ¶¶ 114–119, 157. Accepting these allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, Defendants, on at

[10] The NYLL contains separate provisions regarding the frequency of pay for railroad workers, commission salespersons, and clerical or other workers. *See* NYLL § 191(1)(b)–(d). Clerical and other workers, for example, must be paid "in accordance with the agreed terms of employment, but not less frequently than semi-monthly, on regular pay days designated in advance by the employer." *Id.* § 191(1)(d).

least some occasions, failed to timely pay Plaintiffs in violation of the FLSA and NYLL. *See Belizaire*, 61 F. Supp. 3d at 353–54 (finding the plaintiff's allegations that the defendant had the "habit of paying [him] with bounced checks" and that he did not "receive[] [his] payroll check in a timely manner" sufficient to state both a NYLL and a FLSA claim for late payment). Plaintiffs, therefore, have stated a late payment claim.

2. Tip Violations and Failure to Pay Commission

Plaintiffs also allege that Defendants unlawfully shared tips with tip-ineligible employees and failed to pay owed tips and commissions. *See* TAC at 24.

i. Tip Violations

The FLSA provides that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips." 29 U.S.C. § 203(m)(2)(B). Similarly, the NYLL prohibits employers from "demand[ing] or accept[ing], directly or indirectly, any part of the gratuities received by an employee, or retain[ing] any part of a gratuity or of any charge purported to be a gratuity for an employee." NYLL § 196-d. "The test for whether an individual is an 'employer' forbidden from keeping employee's tips under the FLSA and NYLL is the same as the one used to assess individual liability." *Mangahas v. Eight Oranges Inc.*, 754 F. Supp. 3d 468, 501 (S.D.N.Y. 2024). The Court considers whether the individual: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* (quoting *Carter v. Dutchess Comm. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). "[F]or purposes of the NYLL, the New York Court of Appeals has defined 'agents' of an employer or 'managers' ineligible for tip pool participation as individuals with 'meaningful authority' even if that

authority is not necessarily 'final authority.'" *Id.* at 502 (quoting *Barenboim v. Starbucks Corp.*, 995 N.E.2d 153, 160 (2013)).

Plaintiffs have adequately alleged tip violations. Plaintiffs state that manager Chahir received tips from the tip pool. *See* TAC ¶¶ 46, 86, 89, 182, 191. Plaintiffs have also plausibly alleged that Chahir—a Skinny's manager with control over Plaintiffs' attire and work schedules, TAC ¶¶ 45, 47, 66, 76–77, 166–67—is not tip eligible. *See Mangahas*, 754 F. Supp. 3d at 504 (explaining, collecting cases, that a managerial role generally precludes participation in the tip pool). In addition, Plaintiffs state that Skinny's failed to pay them their tips on multiple occasions. *See, e.g.*, TAC ¶¶ 191 (Davila), 84–85 (Beltran), 125, 143 (Samuels); *see also id.* ¶¶ 183–84, 190 ("Plaintiffs [each] . . . received a fixed income each week . . . despite significant fluctuations in working hours and tip ranges."). Plaintiffs have, therefore, plausibly alleged that Defendants unlawfully withheld their tips under the FLSA and NYLL.

ii. Failure to Pay Commission (Davila)

Davila also alleges that Defendants violated the NYLL because she was hired with a commission bonus but never received commissions. *See* TAC ¶¶ 17–18 (alleging that although her manager told her when she was hired that she would be paid an hourly rate "and a commission of 15% for every party she brought into the restaurant," she was never paid commission). Section 191(1)(c) of the NYLL provides that a "commission salesperson shall be paid . . . commissions and all other monies earned or payable in accordance with the agreed terms of employment." On these allegations, it is at least plausible that Davila was contractually entitled to commissions. *See* TAC ¶ 17. Defendants' main objections to Davila's claim—for example, that her claim is insufficiently detailed with respect to how many parties she brought into the restaurant and when—do not defeat her claim and, instead, present factual and damages-

related issues that are premature to resolve on a motion to dismiss. *See, e.g.*, Mem. at 19–20. As Davila correctly notes, she "need not prove each and every unpaid commission at this pre-discovery stage." Opp. at 18.

3. Failure to Pay Overtime Wages

Plaintiffs' claim that Defendants failed to pay overtime wages fails. Plaintiffs allege, without further detail, that Defendants reduced their total hours worked, even though they performed overtime work in excess of 40 hours per week. *See id.* ¶¶ 188–190, 254–56.

Although Plaintiffs need not specifically allege the number of unpaid regular and overtime hours, "[t]o plead a plausible FLSA overtime claim, Plaintiffs must provide sufficient details about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 & n.10 (2d Cir. 2013). Plaintiffs have not done so here. Plaintiffs' complaint—which does not allege facts on a plaintiff-by-plaintiff basis, nor provides a sense of when, if at all, Plaintiffs worked in excess of forty hours without pay—is too sparse to state a claim and essentially amounts to a "rote recitation of the statutory elements, and the assertion, in blanket terms, that the law was violated without providing any factual underpinning." *John v. Dep't of Educ. of the City of New York*, No. 15 Civ. 2407, 2016 WL 4539209, at *3 (E.D.N.Y. Aug. 30, 2016). This claim is, therefore, dismissed.

4. Retaliation

Plaintiffs state that they were fired because of their complaints about Defendants' pay practices. *See* TAC ¶¶ 61–67, 95–101, 125–32. The Court concludes that each Plaintiff, except Bamba, has plausibly alleged a retaliation claim under the FLSA and NYLL. "FLSA and NYLL retaliation claims are analyzed under the same standard." *Williams v. Harry's Nurses Registry,*

*Inc.*, No. 23 Civ. 6661, 2025 WL 2481745, at *7 (E.D.N.Y. Aug. 28, 2025). Plaintiffs alleging retaliation under these statutes "must first establish a prima facie case of retaliation by showing (1) participation in protected activity known to the defendant . . . ; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010).

Each Plaintiff, with the exception of Bamba, has pleaded a *prima facie* case of retaliation under the two statues. First, Davila, Samuels, and Beltran participated in protected activity by making complaints about pay practices to management and human resources. For example, on May 21, 2024, Davila complained to managers via WhatsApp that "staff have to deal with 'bounced checks' and have 'been without pay for weeks.'" *Id.* ¶ 61. Davila also complained that her "schedule was taken" because she expressed concerns about pay. *Id.* ¶ 62. In addition, Samuels complained to human resources on several occasions—including, but not limited to "November 29, 2023, December 1, 2023, March 8, 2024, March 9, 2024, March 25, 2024, April 11, 2024, May 13, 2024, and May 15, 2024"—"about bounced checks, late checks, and other fees related to her paychecks." *Id.* ¶ 119. And on April 4, 2024, Samuels questioned a manager about when her paycheck—which was a week late—would be available. *Id.* ¶ 120. As of late as April 12 and May 14, 2024, "Beltran . . . complained [to management] about tip pooling, late payments, and bounced checks . . . via text message." *Id.* ¶ 85. Like Davila, she also complained to managers on May 21, 2024, about not getting paid. *Id.* ¶ 96.

Second, Davila, Samuels, and Beltran each allege adverse employment action. Davila and Beltran were fired on May 21, 2024, the day they made complaints via WhatsApp. *See id.* ¶¶ 63, 96. That same day, Samuels was removed from Defendants' group messaging apps, and, on May 24, Samuels learned she had been fired when she showed up for work. *See id.* ¶¶ 127–

130. Beltran further alleges that "each time" she complained about paychecks bouncing, she was "taken off the schedule and not given shifts." *Id.* ¶ 91. Davila also alleges that a manager once sent her home early from a shift after she questioned the manager about tip pooling. *See id.* ¶ 43. Actions such as reducing an hourly employee's shifts "well might have dissuaded a reasonable worker from making or supporting similar" complaints, and, therefore, constitute adverse employment actions for the purposes of a retaliation claim. *Mullins*, 626 F.3d at 53 (citation omitted).

Finally, Davila, Samuels, and Beltran have plausibly alleged a causal connection between the protected activity and the adverse employment action. A causal connection between an adverse action and a plaintiff's protected activity "may be established . . . 'by showing that the protected activity was closely followed in time by the adverse action.'" *Id.* (citation omitted). In this case, Beltran and Davila were fired on the same day they made complaints about pay practices, raising a strong inference of retaliation based on temporal proximity. *See id.* ¶¶ 63, 96. Samuels, too, was fired that same day or shortly thereafter, after she, too, had been complaining about pay practices in the preceding weeks. *See id.* ¶¶ 119–20, 127–30. With respect to cancelled shifts, both Beltran and Davila allege that their shifts were reduced when they made their complaints, providing circumstantial evidence of retaliation. *See Habib v. Allied Universal Exec. Prot. & Intel. Servs., Inc.*, 795 F. Supp. 3d 406, 430 (E.D.N.Y. 2025) ("[E]ven minimal circumstantial evidence may support an inference of retaliatory intent.").

Bamba's retaliation claim is dismissed because the complaint is devoid of specific allegations with respect to when Bamba made her complaints about pay practices and when she was fired. *See* TAC ¶¶ 157–159.

5. Unlawful Deduction of Wages

The "NYLL restricts an employer's authority to take deductions from an employee's earnings, providing that an employer may only deduct an amount from an employee's wages if 'such deductions are either made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency, or expressly authorized in writing by the employee and are for the benefit of the employee.'" *Karic v. Major Auto. Companies Inc.*, 992 F. Supp. 2d 196, 202 (E.D.N.Y. 2014) (quoting *Perez v. Westchester Foreign Autos, Inc.*, No. 11 Civ. 6091, 2013 WL 749497, at *10 (S.D.N.Y. Feb. 28, 2013) (internal quotation marks omitted)); *see* NYLL § 193(1). Plaintiffs allege that Defendants required customers to pay "admin fees," and if customers refused to pay an "admin fee, which often occurred," Defendants would charge Plaintiffs for that amount and deduct it from their pay. TAC ¶¶ 270–72; *see also id.* ¶¶ 44, 93, 192. Plaintiffs did not authorize these deductions, nor does it appear that they were made in accordance with a law or regulation. *See id.* ¶ 273. Therefore, Plaintiffs have plausibly alleged that Defendants unlawfully deducted their wages in violation of NYLL § 193(1).

III. Leave to Amend

The Court denies Plaintiffs leave to amend their dismissed claims because Plaintiffs have already amended their claim three times, and despite being presented with several opportunities to amend their pleading in response to Defendants' pre-motion letters and multiple motions to dismiss, their complaint remains deficient in certain respects. It is unclear how the defects in their counterclaims could be cured, and to date, Plaintiffs have not proposed any specific amendments. *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) ("[D]enial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured."); *Ank Bey El v. CitiMortgage, Inc.,* No. 25 Civ. 2317, 2025 WL 3552702, at *8

(E.D.N.Y. Dec. 11, 2025) ("If [a party] attempts to request leave to amend in [its] opposition brief, without proposing specific amendments, the Court will not be inclined to grant leave to amend."). The Court, therefore, denies leave to amend the dismissed claims.

## CONCLUSION

Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Defendants' motion is DENIED as to Plaintiffs' First Claim (race discrimination, with respect to all Plaintiffs), Third Claim (gender discrimination, with respect to Davila and Samuels), Fourth Claim (retaliation based on gender, on behalf of Davila), Fifth Claim (body size discrimination, with respect to Davila, Beltran, and Samuels), Sixth Claim (late payments, with respect to all Plaintiffs), Seventh Claim (tip violations, with respect to all Plaintiffs, and failure to pay commission, with respect to Davila), Ninth Claim (FLSA and NYLL retaliation, with respect to Davila, Beltran, and Samuels), Tenth Claim (unlawful deduction of wages, with respect to all Plaintiffs), Eleventh Claim (religious discrimination, with respect to Bamba), and Twelfth Claim (national origin discrimination, with respect to Beltran).

Defendants' motion is GRANTED WITH PREJUDICE as to Plaintiffs' Second Claim (retaliation based on race, with respect to Davila and Bamba), Third Claim (gender discrimination, with respect to Beltran),[11] Fourth Claim (retaliation based on gender, with respect to all Plaintiffs except Davila), Eighth Claim (failure to pay overtime wages, with respect to all Plaintiffs), and Ninth Claim (FLSA and NYLL retaliation, with respect to Bamba).

By **September 23, 2026**, the parties shall file a joint letter addressing the status of discovery, as well as a revised proposed case management plan and scheduling order. In their joint letter, the parties shall state whether either party objects to another settlement conference

[11] This claim is dismissed because Beltran withdraws her claim. *See* Opp. at 13–14.

before the Honorable Valerie Figueredo or to a referral to the Southern District's mediation program.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 53.

SO ORDERED.

Dated: September 2, 2026
New York, New York

ANALISA TORRES
United States District Judge